United States v. Frank George Owens, Eric Glenn, and Eric Glenn Parker. You may proceed. May it please the Court, my name is Joshua Turner and I represent Eric Glenn Parker. I asked for oral argument in this case specifically to discuss one issue and it was one that I brought pre-trial, during trial, and post-trial. How have you done so far? I'm looking up. I'm optimistic about today. Which I lost on all those issues at all those given times. And I'm still adamant about the prospects that venue was not proven by the government. In 2003, I was in a trial practice class and my teacher was a guy named Tommy Mayfield. He said he would wake up in a cold sweat in the middle of the night for fear that he had not proven venue. He was a prosecutor for Hines County District Attorney's Office. He said before every trial, he would go in at the top of his legal pad and write venue on it. And he would not stop until he had crossed it out. In this case, Mr. Parker was convicted of three counts. Count one was a RICO conspiracy count. Count two was a conspiracy to traffic methamphetamines. And then count four was a Vicar murder charge. And according to this circuit's analysis on conspiracy and venue, each count has to be assessed separately. And first and foremost, he was charged under a RICO count. Well, all the testimony that occurred in this case came from 27 witnesses. There were 52 exhibits. There's absolutely nothing that puts Mr. Parker in the Northern District of Mississippi. Under even the government's best factual scenarios, starting under the RICO analysis, every act that's alleged in the indictment happened in the Southern District of Mississippi as it pertains to Mr. Parker. Is that how we evaluate that? Whether in the RICO conspiracy did anything happen in the Northern District? Not if it's a continuing offense. And if it's a continuing offense, it would be considered plausibly that could occur. The acts that the government portrayed in the indictment didn't line up with the testimony of their own witnesses, though. They said because of the allegations in count two, the drug conspiracies, that those were in furtherances of the Aryan Brotherhood enterprise. Well, their own witness in Brandon Creel just crucified them on that. And he said, no, no, no. Well, that's as to the second venue, right? That's right. I'm asking you about the RICO conspiracy venue. Are you good with that? You're not good with that. I'm not okay with it, but, I mean, there's nothing that ties him to the Northern District. Well, does it have to be something that ties him under the RICO conspiracy, or is it satisfactory if the conspiracy took place in the Northern District? Admittedly, there's not many cases that line up like this. The Nito case is probably the closest one that this Court has decided that's similar in any kind of fashion. And in that case, there's co-conspirators that put Mr. Nito and the other participants in that case in Dallas, which was in the Western District, as part of an agreement. But there's no agreement here. There's no overt act here. The allegations against Mr. Parker all occurred back in 2009, and then he has no association with the Aryan Brotherhood after that. And the conspiracies that the Northern District, as far as the facts go from the government's position, came about in 2012. There's nothing prior to that that links them to those things. And when asked about the actions that were trying to be used to associate Mr. Parker with the Aryan Brotherhood then, that were criminal, came from Perry Mask, who testified he never even met Mr. Parker. From Michael Hubanks, who said, I don't know who he is. And I asked each of these people as it pertained to the money laundering, the guns that were involved, the pounds and pounds of methamphetamines, what did this have to do with the Aryan Brotherhood? And Perry Mask, who was a shot-caller, wheeled for the Aryan Brotherhood, said nothing. They had their own thing going on down south. Can we talk about the trafficking of the meth? Assuming, Arguendo, that you were correct, that Venue did not lie on that count, what is the practical difference of that, if you separated that one out? How does that affect anything here? I was just taking them count by count practically. Right, but assuming, Arguendo, that you're correct, and you, just Arguendo, that you were right about Venue on that count, what result, what practical result in the case? Well, may I be allowed to go to my count four, which is, I was going to argue the exact same thing with it. I mean, there are multiple ways, I guess, that this Court could rule. I'm asking that Venue not be associated and correct for all three. But if I were to be correct on counts two and count four, this Court would have to reverse on those counts and render. And if they found, if the Court found Venue was correct on count one, they'd have to be reversed for resentencing. Right. Would it matter for the, I mean, it's RICO conspiracy. If there is, and then you're saying that for the murder, it also, you lack Venue. Absolutely. But, okay, what if we were justifying that the meth was the one that lacked Venue? What if we were justifying? Do we, if that was the only one we found on? Then it really wouldn't, I mean. Then I don't think it matters, does it, even if you're right about Venue? I'm sorry, I disagree as it goes to RICO. Okay, I'm not asking you to concede your three arguments, but I'm just saying if you win on the middle argument and don't win on the first and the third argument, does it change the result in the case? What happens in the case? It would just be that he would get the same sentence. He would get the same sentence, so we wouldn't have to remand for resentencing. We would just vacate that conviction for his lack of Venue. I apologize. Is that correct? Yes. Okay. You're more ambitious than that is what you're biting us on, I think. Yes, Your Honor. Okay. Are there any other consequences that flow with having that meth conviction that if it was vacated, it didn't matter for any reason? It was being used as a predicate for the racketeering as far as the government's allegations go under the RICO overt acts. And as it goes to Mr. Parker, the only two acts that he's being told are associated with him specifically or that he even knows about are that and the murder. And when it comes to the murder, the allegations were that that all occurred in the Southern District of Mississippi. There's absolutely nothing about it. If the government's correct, it doesn't continue. It begins and ends in the Southern District over a drug debt that Mr. Creel specifically said was not related to the Aryan Brotherhood. If the government's correct, Michael Hudson's killed in or around Gautier, Mississippi. But there's no question about it. It's in the Southern District of Mississippi. And it's all predicated on a drug debt that's not Aryan Brotherhood related. Now, the government can say that it is, but there's nothing in the record that shows that. I mean, I've scoured the record. I was the trial counsel for this case. There's nothing in the record to support that the drugs or the murder are Aryan Brotherhood related as far as the testimony goes. Their own witnesses, Mr. Creel in particular, who was the one that disposed of the body, that testified against my client said it was not. So those two counts absolutely have no venue issues that lie in the Northern District. The Rico count has—I fail to see how the government makes that leap by just saying that he's a member of the Aryan Brotherhood because as far as the testimony goes, that's all they have. And from what I can tell as far as the Aryan Brotherhood, what they were doing that was criminal as an enterprise goes that they put on for proof, everybody said that it wasn't Aryan Brotherhood related. The other portions of the Vicar murder charge that were argued by the government and by the district court that say, hey, venue's proper in the Northern District of Mississippi has to do with it being a Vicar murder charge. The Second Circuit has analysis. The Fourth Circuit has analysis. And by all stretches that you look and read at any of those tests, they fail to get venue into the Northern District through their— Do you recall—a lot of you recall how you argued this in your opening brief on the Vicar murder as to what the proper standard for venue was? My recollection of it is, since I don't want you to turn to me pages, you really didn't give us a standard. You just said that venue for one doesn't necessarily mean venue for all, which hasn't really given us much to go on as far as an argument on why the murder charge was brought in the wrong district. Well, I apologize. After reading the district court's order, after I didn't see the district court addressing the Second Circuit or the Fourth Circuit, I was just operating off of venue law as it stood in Mississippi with this court, and I didn't find anything that could tie it as far as Fifth Circuit law, talking about Vicar murder charge under these— and looking at the Second Circuit and the Fourth Circuit. That may have since changed since I briefed it. If it has, I apologize. I'm operating off of Sixth Circuit— I mean, excuse me, Sixth Amendment and venue law as far as where does it lie, and there's nothing that ties it to the Northern District of Mississippi. I'm trying to argue a negative, I feel like, sometimes by saying I can't point to you in the record where it exists because the government failed to prove it as an element of the crime. I'm sorry I'm out of time. Why aren't you disregarding Vicar? That is, if this were just an ordinary murder case, the venue would be a little different than in Vicar because if we take the Second Circuit's idea about suitability of the venue for accurate fact-finding, there's no problem. These are very close to each other in Mississippi. It's not like Texas spread out everywhere. Well, you said Second Circuit, Your Honor? Is that what you're asking me about? Yes. I believe that the Second Circuit operates— The fourth element in there was the suitability of the venue chosen for accurate fact-finding. Yes. That's not a problem here. You're talking about the read factors that are, I think, that are quoted in Sevedera? Yes. I'm probably butchering that and I apologize. But it's my understanding that all four of those factors have to be met. And I'm sorry, I'm going to butcher this. Sevedera, they even go so far as to make an argument for me prior to laying those out and talk about instances that might would have occurred in Idaho months before. But they wouldn't, because they had concluded, they wouldn't now have venue in— it was somewhere in Brooklyn, I believe, is where it was. In the Second Circuit, they wouldn't be able to make that connection because it was over. And that's how I interpreted that. When you asked about suitability of the venue, I have to say that there's nothing about the Vicar murder that shows any attachment at all as far as those four factors, the site of the crime, its elements in nature, the place where effect of the criminal conduct occurred, and the suitability of the venue. Well, it fails the first factor. So your position is you win regardless of whether we apply the Second or the Fourth Circuit's test on this point? Yes, Your Honor. I think you've saved some time for rebuttal. I did. Okay. Thank you. Thank you. Good afternoon. I'm Gregory Weber. I'm representing Frank George Owens, Jr. in this matter. Your Honors, I have two main points I want to argue and a corollary. First, I'm going to argue about the introduction of the photograph of my client. And I think it was error. It was highly prejudicial. And in addition, there was other racially charged evidence that was introduced, which I think requires the court to either set aside the verdict against him or, at the very least, grant him a new trial. Second, I believe there was insufficient evidence to support the Viker murder charge, and it should have been taken from the jury or it should be sent back for proper instruction regarding corpus delicti under Mississippi law. And a corollary to that argument involves what I believe was improperly introduced evidence from a girlfriend of Mr. Parker, which I believe was very damaging evidence that does not meet the Confrontation Clause requirements for out-of-court statements. Starting with the photograph, as the court well knows, the Aryan Brotherhood was a white-only gang. The photograph that was introduced prominently displays swastikas, and that's bad enough. I mean, I don't think the court can come up with a symbol or a sign of anything of racial intolerance that could possibly compare with a swastika. And yet that was introduced on the photograph. It could have been. The answer, I believe, could have been that they could have staged the photograph somehow to either eliminate that or just made reference to it. There was numerous references throughout the record to the fact that he bore a swastika tattoo. But did you preserve that objection? It was in a motion in limine that the court entered originally, which found that it was more probative than not. So we believe it was preserved. He did object. I was not trial counsel. When it was presented again? Well, I'm not sure he objected to the photograph at the time, but he did object in his post-trial motions to introduction of the photograph. Okay. Well, assuming arguendo that it would be reviewed for harmless error, why wouldn't it be harmless? That's a very good question. And the answer to that is I believe what the Eleventh Circuit said in the Bowen case is that the uneasy racial history of criminal law in the United States has yielded a simple rule of thumb. There is no place in criminal prosecutions for gratuitous references to race, especially where here is a serious charge. They said where the defendant's life hangs in the balance. I think race is treated differently than just about every other thing in jurisprudence, and here there can be no dispute that this is a very racially charged issue. I cited the constitutions that were introduced several times. I think there were like four different copies of the Constitution of the Aryan Brotherhood that were introduced, and it has a whites-only policy and a white supremacy policy listed in the constitutions. In addition, there was other evidence that I didn't go into. Four different witnesses were asked whether they were racist, and they had varying responses to that. Some said, I'm a separatist, and then the question after that was, well, a lot of people think that's racism, and they said, well, okay, maybe some do. Well, don't we have a case, though, that said that tattoos really shouldn't be admitted unless they're needed for identifying, but that it's harmless? Don't we? You're talking about the Eleventh Circuit, but I thought we have a case that was a racially charged crime, and we said in that case that the tattoos shouldn't have been admitted. Maybe I'm misremembering it, but are you not aware of this? I'm not remembering the exact facts of that case that you're bringing up. It is settled Fifth Circuit law that tattoos can be introduced when they're probative. But if they're probative, but if they're not, that they can sometimes be harmless, even a race case, which I was thinking about that case where the guy hit the other guy at the bus stop. But never mind. I'm not remembering the facts of that case right off. Counsel, you didn't save yourself much time. I'm sorry. Judge Weiner, did you have a question? No, go ahead. Corpus delicti. Why don't you give us a run on your knowledge of Mississippi law on that? Thank you, Your Honor. It requires, one, the fact of death, and, two, criminal agency as the cause. And how settled is it that we look at Mississippi law rather than more general principles? Thank you. Also a very good question. The biker requires that either under State law or United States law. Well, here there was no question it had to be State law because all the action occurred in Mississippi. In addition, the prosecution and the judge applied Mississippi law, murder law, in coming to the conclusion that there was a biker violation of murder. They didn't use some generic definition. If corpus delicti, as Mississippi sees it, is necessary to show, do you have an argument about the instructions or just the evidence? Well, I have both, Your Honor. I believe the evidence is insufficient. There was no body produced. There was no forensic evidence produced. And, in fact, Creel, the witness, testified that he supposedly disposed of the body, but he says, I assume there was a body. He never saw a body. There are a couple of statements in the record that say, yes, they admitted it, one of which is important and I don't have a lot of time to talk about it, but that was the witness, Jalene Henderson, who apparently was in bed with Mr. Parker when he awoke from a bad dream and said, I killed somebody. That shouldn't have been, it's arguable whether that should have been admitted because it was a spontaneous utterance to someone, but she went on to interrogate him about why. Why did he kill someone? And he said, because they made me. And then she went on and asked him, well, who's they? And then he supposedly said, Mr. Owens and others. So she directly implicated Mr. Owens in something that was not just a spontaneous utterance. It was far more. And so, therefore, I believe that testimony should have been thrown out. She was the only halfway impartial witness in this. Everybody else who testified about Mr. Owens being involved in a murder were all who had either pled guilty to crimes or were charged with crimes. But getting back quickly, if I could, to the corpus delecti. We have your briefing. I'll leave it up to the presider how much you should keep going with this. I think you've saved time for, if you've answered his question, you've saved time for rebuttal. Thank you, counsel. Thank you. Good afternoon, Your Honors. My name is Scott Leary. I was the lead trial counsel in this case. Myself and co-counsel Teresa Walbaum have divided this argument, although we're both prepared to answer any questions you have. I am familiar with the facts of the case. So what's your division of labor? Facts of the case, sufficiency of the evidence, Leary, Rico, Vicar, Ms. Walbaum. Venue? Venue. For you? For Ms. Walbaum. Okay. Although we're both prepared to go with whatever direction that you would lead us. This investigation began in 2013, Your Honor, by the ATF and DEA. It was a Rico investigation because it dealt with the Aryan Brotherhood. The investigation led us to the Southern District of Mississippi. There's been some question as to whether the murder in this case was related to the Aryan Brotherhood or whether it was just a drug murder. And I would respectfully assert that the murder of Michael Hudson was a textbook Aryan Brotherhood murder. As a matter of fact, he was not murdered for not paying drug debt. He was murdered for violating a direct order from a superior. Well, I thought he was supposed to be the evidence. I mean, it comes down as to whether there's evidence to support that. There's some evidence to say he was just supposed to be beaten up. And some evidence that it was suggested that somebody went off on his own to kill him, which would not be part of the Aryan Brotherhood mission that he was on, some personal vendetta or carelessness, beating up somebody rather than going too far. What evidence do you have other than circumstantial, which isn't bad, you can tell me that, that this was connected, that the actual killing as opposed to just the beating up was Aryan directed? Your Honor, I'll assume that the Court has an understanding of the Aryan Brotherhood Constitution and what a direct order is, which is if a direct order is given to an Aryan Brotherhood member by a superior, it must be followed. And if it's not, the inferior party is subject to the same discipline. In the summer of 2010, Eric Parker, a captain, sold methamphetamine to Michael Hudson, an Aryan Brotherhood soldier. Hudson did not pay for the meth because he said it was bad. Eric Parker did not go to Michael Hudson with this problem. He went to the Aryan Brotherhood. And James Dean testified that there was a church meeting with over 25 Aryan Brotherhood members to discuss this dispute between Eric Parker and Michael Hudson. Then there was a second church meeting where the Aryan Brotherhood was present, Michael Hudson was present, and they actually put Eric Parker on a speaker phone. And during that meeting, the Aryan Brotherhood told Michael Hudson, you have two weeks to pay the debt and you can pay half of it. That's in James Dean's testimony. So that's the first direct order to Michael Hudson. Two weeks, one half. He disobeyed it. Disobeying a direct order results in an elevation, a punishment. And so what happened was Brandon Creel, who was the spoke or general for the Aryan Brotherhood in the free world at that time, ordered minutes, which is a physical assault between Eric Parker and Michael Hudson, the second direct order in this case. Michael Hudson did not comply. And he violated a second order. Now, Brandon Creel testified that a captain has the ability to elevate a second violation to a smash. And under AB nomenclature, a smash or an SOS, smash on sight, is what was ordered next for two violations of direct orders. Frankie Owens ordered an Aryan Brotherhood subordinate, James Dean, to kidnap Michael Hudson and take him to a residence for beating. James Dean said he had to comply with that direct order because if he didn't, he would be subject to the same punishment. Frankie Owens, a captain, also told Sonny Maxwell, who was an Aryan Brotherhood prospect, that if you comply with this order, it will be your Aryan Brotherhood blood end mission. So Sonny Maxwell complied with the order, and after he kidnapped Michael Hudson, he was actually patched. He was able to join the Aryan Brotherhood based on that kidnapping. But we haven't gotten to the killing being part of being directed by the leader yet. Yes. Yes, Your Honor. And after he was beaten, he was kidnapped a second time and taken to Eric Parker's residence. The second kidnapping, taking him to the murder, was by Frankie Owens, Mitchell Valentine, and Walter Burris. Valentine and Burris said we had to take him to Eric Parker's house because if we didn't, we would violate a direct order by the Aryan Brotherhood and be subject to the same punishment. So therefore, pursuant to orders by an Aryan Brotherhood superior, Michael Hudson was beaten and taken to the scene of his death. Well, I'm still not hearing, is the evidence contested? What you're telling me is perhaps the way the government sees the evidence. I think there's, is there not evidence that says that does not support that he was actually ordered to be killed, that something happened by the person who was actually involved and did kill him that was not fully explained, and the death of Hudson was a result of that? I mean, it seems to me that tying the murder is central to some of these counts, tying the murder to the Aryan Brotherhood actually ordering it. So tell me, what's the contrary evidence to what you just told me? Contrary to where this was not an Aryan Brotherhood murder? Yeah, the murder was not ordered. It just was ordered. I don't know. Well, now, Kelsey, you could do better than that. Well, Frankie Owens told Thomas Parker, he admitted to Thomas Parker and Thomas Parker's testimony that first he said, I killed him. That's the first thing he said. The second was, I took Michael Hudson to Eric Parker to get blood on his hands, to make him stand up for it. Because what the evidence was was that Eric Parker had been threatening Michael Hudson. And so Frankie said, I took his body to Eric Parker to get blood on his hands and to see if he could stand up for it. And then Eric Parker confirmed that when he told his girlfriend, I had to do it. So what does that mean, to get blood on his hand and make him stand up for it? In Aryan Brotherhood, in the world of the Aryan Brotherhood, he had threatened this man. And so, therefore, he brought him this man to see, are you just all talk? Or are you going to do what you said you would do? Well, why wasn't assaulting him good enough under the rules? I mean, I don't understand that there's a tie that the Aryan Brotherhood leadership wanted the killing of the man. Oh, I think Frankie Owens and Eric Parker are Aryan Brotherhood leadership. They are captains in the organization. They're the ones that ordered the murder of Michael Hudson. But where did they order the murder? Well, I don't have an example of where they – I don't have – Isn't there some testimony where somebody ordered the murder? And that's what I'm – this seems to be missing here. Frankie Owens told Mitchell Valentine and Walter Burris and James Dean that I'll be taking Michael Hudson to Eric Parker's residence so that he could face Eric Parker. But that doesn't mean he wants him to kill him. That's what I – where is that evidence? Well, I would have to say we didn't have any eyewitnesses to this, you know, except for the defendants. So is that – so in answer to Judge Southwick's question, the answer is there's a big gap between taking the guy there and wanting him to get blood and wanting him to be killed. Is that the best argument for the other side? You don't have to buy into big gap. Just say gap. Yes, Your Honor. I would just – and I'll deference the court because I'm just sitting here. But I would say that is a very tiny gap because I would – when you have Aryan Brotherhood folks order a kidnapping and order him beaten and then order him taken to this man's house so that they can get blood on his hands, they have two captains that orchestrated this murder. Or maybe – – spent most of his time on venue. Are you or Ms. Owen – I'm sorry, Ms. Walbaum going to talk about that? I probably ought to. Unless you have more questions for me, I can – and I'm more than happy to ask them. I'll back down right now and let Ms. Walbaum deal with venue questions. And anything else that we have. And anything else. Go ahead. Thank you, Your Honor. Good afternoon. May it please the court. Teresa Walbaum for the United States. I am happy to discuss venue before I do that. If I may just address the question about the order. Under RICO and Vicar law, it's not legally required that there be a specific order. It is sufficient if it's understood that that is required. We still need some sort of directive, implied or otherwise. And it seems to me that the clear evidence is it was supposed to be a kidnapping. The other evidence is he's disappeared. And whether he was killed or not, I think the evidence is very strong on that circumstantially. Whether it's sufficient or not, we'll have to resolve. But it seems to me that you don't have anything suggesting that anybody other than the actual killer wanted him dead. But, Your Honor, those were – those killers were themselves management within the Aryan Brotherhood. And they were operating – Who do you say killed Hudson? Owens and Parker. Physically did it? Yes. And then they contacted Brandon Creel, the free world wheel, to dispose of the body. And that is – he did that. So when the leadership decides or makes a mistake and kills somebody he was only trying to beat up, does that become an Aryan Brotherhood killing? Yes. It was. It was orchestrated, ordered, coordinated, executed. You're using words that don't fit my scenario. It was only supposed to be kidnapped. And somebody got carried away, got angrier than he should have been. Hudson was maybe being more successful in fighting back. Who knows? And a death occurred that no one knew about until it actually occurred. Nobody had ordered. Nobody wanted, which is difficult to know what that means in the Aryan Brotherhood, but nobody was directing until the actual killer, whichever one it was, did it, and it was not at anybody else's direction or even his own. That's still sufficient? Yes, Your Honor. We'll have to provide – to beat up to that extent and death occurs, it's not unpredictable, is it? It's completely foreseeable, and it's also pretty typical. As my co-counsel said, this was textbook Aryan Brotherhood murder, and the fact that it wasn't precisely planned to every detail that they were going to kill him, when you hogtie somebody and hit them over the head in the course of the assault and drive them 100 miles and then you take them into another trailer to beat them more, it is entirely foreseeable that a murder is going to result. And again, both those men were captains, and it was orchestrated entirely with the assistance before, during, and after with Aryan Brotherhood. There was no non-Aryan Brotherhood member involved in this entire scheme. What's your best case that foreseeable is enough and it doesn't have to be intentionally planned? Well, Your Honor, I think, again, going back to their acts involving murder is one of the racketeering activity for the conspiracy, and under the RICO definition, acts involving murder, if we're talking about the RICO conspiracy, it can be any inchoate crime. So at any of the attempted murder, the completed murder, the conspiracy, all would be acts of murder for the RICO conspiracy purposes. For the Vicar murder, I would say that, again, it was – this is typical. I mean, not just in the Aryan Brotherhood, but in many cases. Do you have a case or not? I do not have a case off the top of my head, Your Honor. Okay. If I may turn to venue, as I had promised, the venue was proper in the Northern District of Mississippi on all counts. The case law regarding the RICO conspiracy and the drug trafficking conspiracy is clear. It is that they are both continuing offenses, and you may be prosecuted in any district where any co-conspirator committed an overt act. Looking at what was happening in the Northern District of Mississippi, there is evidence in the record from Perry Mask that, starting in 2010 at the latest, that he was engaged in drug trafficking and money laundering in the Marshall County Jail and with other Aryan Brotherhood members. They would bring drugs in, and they would money that laundering. They would launder those drug proceeds. That money would then go to provide care packages to the Aryan Brotherhood members. It would pay for bail for the Aryan Brotherhood members and legal disputes outside of the jail. That was one key piece of the evidence. And he's upset, Mr. Mask is upset, because in August of 2013, Frankie Owens orders the murder of Jeremy Bailey, and that is going to disrupt his plans because they get him put into lockdown and sent to another facility, and that destroys the Aryan Brotherhood's racketeering activity in the Marshall County Jail. And in addition to that, there is evidence from Brandon Creel that he, as the free world wheel, went back and forth to the Northern District in 2010, and in order to set up chapters, appoint people as managers, and to basically deal with any issues that arise. That is all in the record, that there was, from 2010 to 2013, money laundering and drug trafficking in the Northern District. After 2010, there's also acts involving murder, including the attack on JB. So those are more than sufficient. As the Supreme Court has made clear in Hyde, the defendant did not ever enter the district. This court has held in Posada Rios. The defendant does not need to know every member of the conspiracy, and they don't need to know him, and he doesn't need to know what everyone is doing. Does it matter that this second count was under the Drug Abuse Prevention and Control Act and not under a RICO? There's no RICO umbrella for that count. Your Honor, this is all . . . It's a different conspiracy. Well, except that Mr. Parker is in the conspiracy. If you look at the racketeering activity . . . But it's not a racketeering charge. It's a Drug Abuse Prevention and Control Act under 21 U.S.C. 841 and 846. It's under that, not under RICO, for the second claim. But the drug trafficking is one of the types of racketeering activity charged in the RICO conspiracy. Well, but for the drug charge, the meth charge, does it matter that that is not under a RICO statute umbrella for the drug charge? And if not, why not? Because it is also . . . it does not matter because the same conspiracy law applies. RICO conspiracy, as the Supreme Court said in United States v. Salinas, is only an expanded form of conspiracy. But it's an expanded form of conspiracy. Is there any . . . you didn't cite any case that says that the Drug Abuse Prevention and Control Act also uses an expanded form of conspiracy? No, but it does not need to here, Your Honor, because the people charged in that conspiracy include Perry Mask and Stephen Hughbanks and Mr. Parker, and those are all the people who were engaged in the drug trafficking. That is sufficient for both the RICO conspiracy and the Drug Abuse Museum. Well, is there a . . . I don't think that there's evidence that the drug trafficking was in furtherance of the ABM. Instead, it's his business on the side. No, Your Honor, I respectfully disagree with that. I think that, first of all, there is evidence that Perry Mask testified that the drug trafficking, the proceeds, went to the benefit of the Aryan Brotherhood. Whose testimony and where? Perry Mask, and she testified on the third day of trial. I'm sorry, I don't have that specific site available. Okay. But he did testify as to the benefits. Whether Perry Mask and Brandon Creel stated that some of this might be personal . . . Personal. . . . is really not the issue, because the jury heard a lot of evidence about how the Aryan Brotherhood worked, and they decided that it was an enterprise . . . it was the enterprise's activity. And there is . . . it is very common. But they can't decide that if there's not evidence from which they could decide that. And so, you're telling me that the evidence is Perry Mask's testimony. That, in addition to the testimony from Perry Mask and others, that the Aryan Brotherhood worked together. All of these people are Aryan Brotherhood members. Well, it doesn't mean everything they did was working together. It does prove significant evidence, Your Honor, that this is racketeering activity, because they benefit from working with people who are other members of the Brotherhood, who are sworn to protect them. They're their sources. They're their suppliers. They're their customers. Why is this brought in the Northern District when . . . This is the second time in, I think, three months that we have had oral argument about an improper venue in a case, just on our luck of the draw. What is going on that people are being put in and we're having all these venue challenges with the . . . Why was this not brought in the Southern District? Well, Your Honor, it was brought in the Northern District as a practical matter, because I think that was where the case began investigation in 2013 and could work backward. But venue was completely appropriate in the Northern District of Mississippi. Congress's intent in passing RICO and VICAR was to allow the prosecutors to have the necessary tools to try these disparate activities under the umbrella of a racketeering enterprise in one district. Well, in your experience, is venue just the defense de jure that people have jumped on and made . . . And it is more common, but VICAR is a continuing offense. RICO conspiracy is a continuing offense. And the enterprise acted, engaged in operations in the Northern District of Mississippi. It was perfectly permissible to try it in that district. I have two other questions. One relates to the tattoo evidence. This was not a mistaken identity case. So the person saying they had not ever been in a group or they were never . . . Why was this evidence introduced when it has the potential for such prejudice? And what's the probity of it, and why would that be harmless? Well, ultimately it would be harmless because both Mr. Parker and Mr. Owens confessed to the crimes, to co-conspirators, and multiple times. So there was ample evidence that they committed the VICAR murder and the RICO conspiracy. So there would be no different effect on the outcome. Introducing gang tattoos is generally accepted to prove membership in the enterprise. But that wasn't . . . At some point they had admitted that they had been in it, so it's not . . . It wasn't probative of that. They didn't need any evidence of that. In this case, because the Aryan Brotherhood is particularly structured and organized, the tattoos had significance. What your tattoo was meant what your membership was. In this case, it was also relevant to his argument of withdrawal from the conspiracy. He wouldn't have had that tattoo anymore if he had, in fact, withdrawn. And it was also relevant to the . . . Was there evidence presented of that? Yes. That he would have had it removed if he had withdrawn? Yes, Your Honor. Multiple people testified that if you were lucky, it was covered up. If you were unlucky, it was cut off or burned off. And it was neither. He still had it. And finally, it is relevant in the case that Sonny Maxwell had obtained that tattoo as his blood-in mission for the kidnapping of Skip Hudson, which was vital proof that it was, in fact, an Aryan Brotherhood mission because he was rewarded for that action. So in the context of an Aryan Brotherhood case where they themselves placed so much importance on these patches or tattoos, it was probative of multiple issues in this case, Your Honor. Okay. You said as your—and it's good because my two questions are related, in fact, because you said as your other reason why it would be harmless is because they told the co-defendants that they had done this and that that was why. Perhaps our law is wrong, and they argue that we should reconsider our law about the co-defendants' testimony and the Crawford and the Bruton. Are we wrong on this and we should rethink this? And if not, why not? No, Your Honor. The Supreme Court has at least twice reaffirmed Bourgeollais and other—and Crawford itself says Koeckensberger statements are non-testimonial. These were non-testimonial statements. They were made by co-conspirators in furtherance of the conspiracy, both before and after. And, in fact, the police came calling. The police came looking for Skip Hudson, and that precipitated a lot of this discussion about keeping your mouth shut and he's not—they're never going to find him. And that is all traditional conspiracy, co-conspirator statement in furtherance of the conspiracy. Nothing that the Supreme Court has said casts any doubt on that time-honored rule, Your Honor. Thank you. May I continue briefly? That argument was split. Some of the things that Mr. O'Leary said about this is textbook Aryan Brotherhood murder, this is a direct order. There's no textbook that we have that we're going off of. It's either a murder or it's not, and it occurred in a way that it existed or it didn't. And this gap that the size of is in question has absolutely to do with something they didn't prove. Everybody is standing here talking about it, and right now all it is is speculation. They didn't prove it. Prove the death or prove the murder? I mean it's been my argument both, but they cannot prove how it occurred that it occurred because of an Aryan Brotherhood directive. They think it did, but they can't point to you in the record and say here's where Brandon Creel testified that this is how it went down because Brandon Creel testified at trial that he did not order that. He did not order a killing of Michael Hudson. So their own witnesses do not corroborate the arguments that they're making here, and I cannot stress that enough. Right now it is just speculation. It is what they want it to be. It's what they hope it to be. It just ain't so. Mr. Walbaugh talked about the same thing, textbook, plan, Aryan Brotherhood murder. It's not in the record. There was some testimony about Perry Mask and his association with Aryan Brotherhood in support of this grand enterprise of drug trafficking. He testified that he was doing this to pay his lawyer. That's in the record. And it's just not there to support the contentions of the government. Lastly, Ms. Wilbaugh said something about Congress's intent about Vicar to be able to try these cases in other districts. That doesn't trump the Sixth Amendment at the end of the day. That might have been Congress's intent, but this court has an obligation to follow the Sixth Amendment. I believe it will do so. I ask this court to reverse and render my client's charges on all three counts. Thank you. Thank you. Thank you. Thank you. I only have a few minutes, Your Honor. I'd specifically like to address Judge Elrod's references. One thing I want to point out real quick is that regarding the feasibility or the foreseeability of murder, the court instructed the jury under Mississippi law that they had to find deliberate designs. So they really couldn't use foreseeability argument by what the court was imposing upon them and what the jury should have found. And I don't think the evidence meets that design anyway, that design standard that they imposed in the instructions. Second, the court, I think Judge Elrod just mentioned, should we reconsider some of the things that we're talking about with statements by co-conspirators? I think we should, obviously. However, with specific reference to Ms. Henderson's testimony, I don't think you have to go there because it clearly under the Delgado test did not result as part of the conspiracy and was not a statement in furtherance of the conspiracy. It was just a statement to a girlfriend that has nothing to do with the conspiracy going forward at all. So those two. And then finally, let me return to the issue about the race card that was played. The tattoo, obviously, I was racking my brain trying to remember the case Judge Elrod was talking about, and it may be that that was unrelated to race. But here it was completely unrelated to race. The crime had to do with only people in the same gang committing an offense against each other in the murder case, and it had nothing to do with race as a topic at all. The issue of race was only brought up to point out the fact that somebody should have a bad view of these defendants. And I think they succeeded in that, and I think that has to be what the court looks at in determining whether this thing should be reversed and sent back for a trial where we delete references in the Constitution to anything about race. Don't allow any questioning about race, and remove the tattoos or at least take different photos or at least use the photos to remove any reference to the swastikas. Thank you. Thank you. This case is submitted. Mr. Turner and Mr. Weber, we note that you are court appointed, and we appreciate your very able assistance to your clients. Thank you.